**THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **JANE DOE** | : | |
| c/o The Friedmann Firm | : | |
| 3740 Ridge Mill Drive | : | |
| Hilliard, OH 43026 | : | |
| | : | |
| Plaintiff, | : | CASE NO. 2:22-cv-3919 |
| | : | |
| v. | : | JUDGE |
| | : | |
| | : | MAGISTRATE JUDGE |
| **FAIRFIELD MEDICAL CENTER** | : | |
| 401 N Ewing Street | : | |
| Lancaster, OH 43130 | : | |
| | : | |
| c/o ACME Agent, Inc. | : | |
| 41 S High Street, Ste 2800 | : | |
| Columbus, OH 43215 | : | |
| | : | **Jury Demand Endorsed Herein** |
| Defendant. | : | |
| | : | |
| | : | |

## COMPLAINT

NOW COMES Plaintiff Jane Doe ("Plaintiff") and proffers this Complaint for damages against Defendant Fairfield Medical Center ("Defendant").

## THE PARTIES

1.      Plaintiff is a natural person residing in Fairfield County, OH.

2.      Defendant Fairfield Medical Center is an Ohio Corporation for Non-Profit doing business in the Southern District of Ohio.

1

3.     Plaintiff was an employee of Defendant as defined by Title VII of the Civil Rights Act of 1964, U.S.C. § 2000e, et seq and the Ohio Civil Rights Act, R.C. § 4112 at all relevant times herein.

4.     Defendant is an employer as defined by Title VII of the Civil Rights Act of 1964, U.S.C. § 2000e, et seq. and the Ohio Civil Rights Act, R.C. § 4112.

5.     Defendant receives federal funding and financial assistance within the meaning of 20 U.S.C. § 1681(a) and is subject to Title IX.

## JURISDICTION AND VENUE

6.     This action is brought pursuant to Title VII of the Civil Rights Act of 1964, Title IX of the Educational Amendments of 1972, and Ohio Laws of Discrimination.  This Court's jurisdiction in this matter is also predicated upon 28 U.S.C. § 1367 as this Complaint raises claims pursuant to the laws of Ohio, over which this Court maintains supplemental subject matter jurisdiction.

7.     Venue is proper pursuant to 28 U.S.C. § 1391, because Plaintiff entered into an employment relationship with Defendant in the Southern District of Ohio, Plaintiff performed her job duties there, and Defendant is doing and has done substantial business in the Southern District of Ohio.

8.     Plaintiff has complied with all jurisdictional requirements and was issued a Right to Sue by the EEOC, which will be filed under seal to protect the identity of Plaintiff.

## FACTUAL BACKGROUND

9.     In order to accurately depict the important events, background regarding the world of Graduate Medical Education is included:

10.     Medical students apply for residency in their final year. They apply to several programs, interview, and then submit a rank list to the National Residency Matching Program.

2

This list includes where they would like to train, ranging from their top choice to their least favorite choice. Residency programs do the same and submit a rank list as well.

11.   A computer algorithm takes some weeks to determine which residents go to which residency program. On a day in February/March, medical students find out where they "matched," and that is set in stone.

12.   If a medical student breaks this contract they will not be able to find another residency program. If a resident wants to switch to another program, while this is mentioned as an "option", the reality is that it is impossible/extremely unlikely to occur and the resident will be cast out of the system, unable to finish their training and unable to practice medicine, saddled with hundreds of thousands of dollars in education debt and years of their lives lost.

13.   Effectively, there is a very unequal power structure in training that can lead to a resident losing their career in the blink of an eye and residency programs know this and commonly exploit it.

14.   Residency programs are provided by the ACGME: Accreditation Council of Graduate Medical Education. They "own" the residency spots, which they very selectively parse out to certain hospitals. The hospitals serve as training sites. Residents train in these hospitals and provide service, patient care and coverage for many hours and patients, generating revenue for the hospitals.

15.   Residency programs, including Defendant's residency program, are educational in nature.

16.   Each year the ACGME checks on the status of residents at programs via an Annual Survey. Programs with poor evaluations can trigger "site visits", whereby an ACGME official surveys the residency program in person.

3

17. The ACGME requires each site to have a residency program director for each clinical program (Internal Medicine, Pediatrics, Surgery), at least one (but usually more) Assistant and Associate Program Directors (who must be of the same specialty), two or more Chief Residents. There is a Designated Institutional Official (DIO) who presides over all programs and is a liaison to the ACGME, the DIO exists to function as someone residents can go to when there is unresolved discord and they have already approached their Program Director.

18. At Fairfield Medical Center, the program director for Internal Medicine is: Dr. Zee, there are no assistant or associate program directors and one chief resident. The DIO is Dr. Hampton: Family Medicine attending, renowned personal friend of Dr. Zee and a part of hospital administration. There is also a GME "liaison" person (not an ACGME defined role) who is Melissa Newman. The Internal Medicine secretary is Pam Hicks.

19. There is also a Family Medicine Residency program, complete with program director, assistant program director, and 2 chief residents chosen by resident votes each year.

20. Ultimately, it is up to the program director who will "paint" a resident in a favorable or unfavorable light to the Residency Clinical Competency Committee. The program director can let an underperforming resident graduate and stymie a well-performing resident.

21. Plaintiff Dr. Jane Doe began her residency with Fairfield Medical Center in July of 2019. At that time, she was one of two female Residents.

22. Due to this, she did not have the benefit of female co-workers to confide in or to support her throughout her employment.

23. Within the first month of her residency, Plaintiff was targeted by another Resident, Dr. Buckley Fechter. Dr. Fechter was on the same rotations as Plaintiff when she began her residency, giving him the opportunity to become obsessed with her.

4

24.     Almost immediately, Dr. Fechter began referring to Plaintiff as his "best friend" even though a friendship had clearly not been established. He asked her to "hang out" repeatedly, almost incessantly. When she declined his almost constant offers, he became aggressive toward her.

25.     On several occasions, Dr. Fechter has touched Plaintiff inappropriately, coming up behind her and rubbing her shoulders and back. Dr. Fechter is a larger individual and is physically imposing, whereas Plaintiff is petite and female.

26.     Plaintiff believes that in the beginning, Dr. Fechter wanted the other male Residents to know that he "got her" and that he wanted to "claim her" as his own in front of them, though she had absolutely no interest in him. He would tell her repeatedly: "You're the prize. You'll get a billionaire husband because you're the prize."

27.     Despite her repeatedly telling him that she did not want to spend time with him outside of work, he became more aggressive and obsessed with her.

28.     In September of 2019, Dr. Fechter badgered Plaintiff about her weekend plans, she replied that she was going to hang out with a girlfriend at her house and could not invite him. He told her that he could come and that she should invite him. She refused. He was extremely aggressive. He stated, "I need you to know I can hang out with you and your friends," to which the plaintiff explained she could not invite him to her friend's house.

29.     Dr. Fechter stalked, sexually harassed, and intimidated Plaintiff until she became physically ill, suffering from extreme anxiety, loss of sleep, weight loss and depression.  In September of 2019, Plaintiff reported Dr. Fechter's conduct to her Chief Resident at the time, Dr. Zeeshan Khan. Due to reasons that will be elucidated, Plaintiff felt that she could not approach Dr. Zee at that time. Because of this and the fact that medical residency is an adherently hierarchical

5

system, she approached her direct superior, Dr. Khan. When she informed Dr. Khan, he already knew about Dr. Fechter's behavior towards her because it was apparent to everyone. Nonetheless, she went to him for help and guidance.

30.     She told Dr. Khan that Dr. Fechter had been approaching her incessantly, repeatedly asking her to hang out and would not take no for an answer. She told him that Dr. Fechter was becoming increasingly aggressive and that other Residents witnessed his behavior. She also told Dr. Khan that she had modified her own behavior by that time, in order to try to "fly under the radar" and avoid Dr. Fechter. Plaintiff avoided the resident lounge because she would be harassed by Dr. Fechter if seen there.

31.     Further complicating matters, Dr. Fechter was close with Plaintiff's Program Director, Dr. Zee. Dr. Fechter would brag that he was Dr. Zee's "fan favorite" and that he had been invited to Dr. Zee's home to go snake hunting (in contrast, no other resident knows where Dr. Zee lives). They have never been invited to spend time with their Program director and do not have such access with privileges. Dr. Fechter would also say that Dr. Zee had "earmarked" him to be the future Chief Resident.

32.     Residents are typically interviewed by a panel of interviewers and evaluated by an entire committee. It was well known that Dr. Fechter had been solely interviewed by Dr. Zee. Dr. Fechter had not matched into a residency program for 2 years after graduation from medical school.

33.     Upon information and belief, Dr. Zee had not investigated this matter further with Dr. Fechter's medical school, University of Cincinnati. It should be noted that after the 2021 investigation (to be described later), Dr. Zee finally called the University of Cincinnati to find out that Dr. Fechter had professionalism and ethical concerns. Dr. Zee denies this, but he himself has told residents that he found out this information regarding Dr. Fechter.

6

34.     Upon information and belief, Dr. Fechter was not even offered an interview at his home institution (which is highly unusual) with the Internal Medicine residency program due to these concerns. This was well known among the residents. Due to the clear pattern of preferential and biased behavior concerning Dr. Zee and Dr. Fechter, Plaintiff felt she could not approach Dr. Zee at that time.

35.     It was stated multiple times that Dr. Fechter is Dr. Zee's favorite. Drs. Guinsler, Guillory, Shah, Son, and Gibson who were residents while Dr. Fechter was in his first year, can attest that Dr. Fechter would commonly announce that he was "the favorite" and had special allowances made just for him.

36.     Dr. Zee was audibly heard making the statement: "Dr. Fechter reminds me of myself when I was younger."

37.     Plaintiff would attempt to hide from Dr. Fechter, but she could not, as the resident schedules were posted online, and he always knew where she was. She could not escape him. Plaintiff felt a need to "make herself small" to avoid him.

38.     She barely spoke, she did not spend time with anyone, and she would physically hide from him in the hospital if she saw him coming. She lived in fear every day. He had memorized her schedule and where her patients were each day in order to force interactions. Dr. Fechter's misconduct occurred daily. How she managed to continue to perform her job, when she was suffering from such turmoil, fear and anxiety, is truly remarkable.

39.     Because Plaintiff was avoiding him, Dr. Fechter would often wait in the parking garage for her to get out of her car and enter the building in the morning. He would not stop approaching her, no matter what she said to him.

40. One day, Plaintiff verbally told Dr. Fechter that she did not want to hang out with him and if she did, she would let him know. This was said in the resident lounge in front of several individuals, as Plaintiff felt safer knowing other people were around. The more Plaintiff avoided him, the more incessant his stalking of her became. He became obsessed and would not stop. Dr. Khan even pulled Dr. Fechter aside to tell him to back off as the Plaintiff was clearly harassed and uncomfortable and he responded, "It's a game to me now."

41. Dr. Fechter then began spreading rumors about Plaintiff at work, saying that other men were in love with her. He began saying things about her in an attempt to slander her character, as she had a stellar reputation amongst attendings, co-residents, and staff. This slander by him continues to the present day. Dr. Imtisaal Waris and Dr. Brandon Boyd can confirm this. Each of these residents were interns starting at FMC and their opinion of Plaintiff was informed by Dr. Fechter's words.

42. The GME administrative head and liaison, Melissa Newman, had known about Dr. Fechter's physical altercation at the start of residency with Dr. Suzanne Mazhuvanchery. Dr. Fechter had taken many photographs of Dr. Mazhuvanchery and refused to delete them. Dr. Shereen Farooq also complained to Ms. Newman about Dr. Fechter.

43. Dr. Farooq of the Family Medicine residency program was on her "Night Medicine" rotation at the same time as Dr. Fechter. She felt uncomfortable as Dr. Fechter would speak about Plaintiff obsessively to her. She could not avoid him throughout the hospital as he would come looking for her. She eventually went to her car to rest. She awoke screaming as she found him circling her car. Upon information and belief, this was recorded on FMC's extensive garage video recording system. Ms. Newman did not act on or escalate these concerns. She was

8

the only one who knew Internal Medicine as well as Family Medicine resident concerns regarding Dr. Fechter.

44.     Ms. Newman went to various Residents around the hospital to ask if Plaintiff had not "misunderstood" Dr. Fechter's advances and even had the audacity to ask others if Plaintiff was being "too sensitive." There were also allegations that Ms. Newman saw Dr. Fechter privately and upon information and belief, was asked to stop doing so.

45.     Defendant has denied that Ms. Newman saw Dr. Fechter privately. Several residents knew that Ms. Newman and Dr. Fechter were seen enjoying each other's company privately at bars. It is something Dr. Fechter would openly talk about amongst the residents.

46.     Dr. Fechter's harassment of Plaintiff never ceased. On another occasion, Plaintiff finished with a patient and went to the resident lounge to finish notes on the admission. She typically avoided the resident lounge completely because she did not want to be seen by Dr. Fechter, but she thought since it was almost 7:00 p.m., she would avoid him. Nonetheless, he showed up.

47.     Another doctor, Dr. David Soha, was also in the resident lounge, relaxing on one of the couches. Dr. Fechter came in and said "Let's go out to dinner right now, I'm hungry." She said "No, I just want to do my notes." He said, "I need you to know that we can hang out and be friends and do things." She explained that she is a very introverted person and didn't want to do that. Dr. Fechter replied "Well, I can come over to your apartment and we can hang out in PJ's."

48.     Throughout this conversation, his voice was getting louder and louder, and Plaintiff was truly terrified by him. During the conversation, Dr. Fechter kept one hand on the back of Plaintiff's chair and the other on the table in front of her. He was very enraged and agitated. Dr. Fechter then went to the door and grabbed a stack of books which he then slammed on the ground

9

close to her. She didn't flinch, didn't move. He was staring at her. He then said, "I am having a tantrum, and you don't even care." She was on the verge of tears but had physically shut down due to the trauma.

49.     Dr. Fechter left the lounge but lingered outside the door to see if Plaintiff went to talk to Dr. Soha. Finally, he left and Dr. Soha came over to ask her if she was okay. If Dr. Soha was not there, she does not know what she would have done, or more importantly what Dr. Fechter would have done.

50.     Shortly after, Plaintiff informed Dr. Khan about this incident. Dr. Khan said he would talk to Dr. Fechter, but everyone knows "he is mental."

51.     In December of 2019, Plaintiff attended the Christmas party thrown by Defendant. All residents were told that they were invited. Dr. Fechter became enraged with Plaintiff upon seeing her in the hall for breakfast because he felt that Plaintiff should have extended a special invitation for him to eat with her.

52.     After breakfast, Plaintiff went back to work in the ICU, and she received a phone call from another Resident, Dr. Parker Guinsler. Dr. Guinsler told her that Dr. Fechter was "losing his mind" in the resident lounge. He was screaming that she was a "cunt" and a "bitch" in front of several other residents, including: Dr. Chris Gibson and Dr. Ryan Guillory. He was throwing chairs against the wall and calling Plaintiff a racist because she "only wants to hang out with brown people." In reality, she only wanted to hang out with people who did not stalk her.  Dr. Chris Gibson witnessed this, as he told Plaintiff.

53.     After this happened, Plaintiff told Dr. Khan that she was going immediately to the Program Director, Dr. Zee. Dr. Khan went with her to speak to Dr. Zee about Dr. Fechter's behavior. Plaintiff started sobbing and told Dr. Zee about all the harassment and stalking.

54.     She told Dr. Zee that she did not come to him before because she knew how much he liked Dr. Fechter, and she didn't think he would believe her. Dr. Zee had even remarked on a prior occasion that Dr. Fechter was "like a younger version of myself." Dr. Khan concurred that he also felt that he could not approach Dr. Zee due to his well-known preference for Dr. Fechter. This is alarming as Dr. Khan was Chief Resident at this time and felt an intern (Dr. Fechter) had more closeness than he did to the program director.

55.     At that point, Dr. Fechter had been stalking her and harassing her so severely that Plaintiff became afraid for her life. Dr. Fechter lived two miles from Plaintiff at that time, and she lived alone. Plaintiff told Dr. Zee that if the hospital fired Dr. Fechter because of her report, she would probably end up in a dumpster somewhere because Plaintiff believed Dr. Fechter was insane and violent. She also asked what Defendant would do to protect her, to which there was no response.

56.     Dr. Zee was renowned for demanding no one involve HR because then things are "out of my hands" and "I cannot protect you or myself."

57.     Plaintiff realized due to Dr. Zee's behavior that she could not bring concerns to him. She actively avoided Dr. Fechter, who aggressively pursued her and tried to initiate contact. And after the way Dr. Zee reprimanded residents from going to HR and the way he treated her when he thought she went to HR (in an investigation outlined below), it is no wonder Plaintiff could not go to Dr. Zee or hospital administration. An actively hostile work environment where the perpetrator was protected and the victim was blamed and harassed had already been established.

58.     Soon after her report, Dr. Fechter found out that Plaintiff reported him to Dr. Zee, and Dr. Fechter began saying that she was "mean" and misunderstanding his advances. From then

on, Dr. Fechter talked about her constantly to other Residents and attendings. She was told by several people that he was "literally obsessed" with her. Residents, including: Dr. Nirmal Shah, Dr. Chris Gibson, Dr. Jae Son, Dr. Ryan Guillory, and Dr. Parker Guinsler can confirm this.

59.     Dr. Zee told Plaintiff that Defendant was simply "not going to lose him" because if the hospital falls below 75% of Residents, the Internal Medicine program could lose its accreditation. Because of that, Dr. Zee explained that dismissing Dr. Fechter was simply not an option. Dr. Zee attempted to convince Plaintiff that she was merely "misunderstanding" Dr. Fechter due to "cultural differences." Dr. Zee also told Plaintiff, in front of coordinator Pam Hicks, that she "needed to get along with others." Plaintiff had made it clear that when pertaining to matters of patient care, she had always interacted with Dr. Fechter appropriately, as was her job.

60.     Dr. Zee then began to tell other residents, including Dr. Guinsler, that he feared for his well-being as Dr. Fechter had been to his house and "knows where I live."

61.     At that point, it became clear that Plaintiff was on her own. Dr. Khan graduated in the summer of 2020. From that point on, she was just trying to survive.

62.     Around November of 2020, several Residents were discussing Dr. Fechter's treatment of Plaintiff and because it was clear nothing was happening to remedy it, one Resident made an anonymous complaint to HR.

63.     As a result, several Residents were interviewed. The anonymous report was also made after ICU nursing staff noticed Dr. Fechter physically holding a nurse's hand against her will. This was witnessed by ICU nursing manager, Tracy Kachenko. This complaint was made known to Dr. Chris Gibson, chief resident at the time. Plaintiff was still terrified that she would be retaliated against because of Dr. Fechter's closeness with Dr. Zee.

12

64. On December 2, 2020, Plaintiff was attending a lecture when Dr. Zee interrupted it, in front of all Internal Medicine and Family Medicine Residents, to tell her that she needed to go to HR. She did not want to go, as she was terrified that she would lose her job and that Dr. Fechter would retaliate against her. This was done out-of-the-blue and in front of all Residents, providing her no privacy. If there was any further investigation or occurrence, everyone, including Dr. Fechter, would link it to Plaintiff due to being called away to HR so publicly. Again, this terrified her.

65. Plaintiff went to the meeting but was emotionally shut down. She could barely speak, and she was terrified. There were several other individuals in the room, and they kept pushing her to speak. She physically could not.

66. She could not answer questions out-of-the-blue to unknown individuals, especially when her experiences thus far with FMC lead her to accurately believe that she would not be protected. Demanding that someone share their most awful experience and re-live trauma in an unsafe environment would only lead to further trauma.

67. Furthermore, in the midst of the investigation, Plaintiff was about to take the final medical board licensing exam, Step 3. She was being harassed by Residents regarding the investigation with daily unsolicited phone calls and conversations. She had prepared to take her exam right when the investigation began. She had to delay her exam due to the stress of her workplace. She had to prioritize her examination and career over the mistimed investigation.

68. Defendant launched an investigation of Dr. Fechter. Every Resident in Internal Medicine and Family Medicine was interviewed. Several residents spoke with Plaintiff, telling her that they reported what they witnessed.

13

69.     Dr. Fechter was removed from service for **one week** while the investigation was ongoing. Then, he came back enraged he had been removed.

70.     He sought retribution for his removal and whoever launched the investigation. He was extremely angry, and he wanted to punish those involved. Dr. Fechter began following Plaintiff almost everywhere she went. He thought Plaintiff had started the investigation and began to stalk her even more aggressively.

71.     During this time, Plaintiff was serving in the ICU during the worst of the pandemic, and Dr. Fechter would stalk her during her entire day, sitting right next to her at computer stations throughout the day. Dr. Fechter was on a Nephrology rotation at that time and often had no patients in the ICU so there was no legitimate reason for him to be following her.

72.     Beginning in January of 2021, Plaintiff's work environment changed drastically. Everyone in Residency Administration, including Dr. Zee, acted distant and cold toward Plaintiff, and people barely spoke to her. Prior to that, she was recognized as the one of the best Residents in her class.  She believes her co-residents would support that she was one of the best Residents in her class.

73.     Before her report, she was assured by several individuals, including Dr. Zee, and multiple prominent members of the hospital board and Resident Clinical Competency Committee, that she would be selected as the Chief Resident. Prior Chief Residents, including Dr. Khan, Dr. Son, and Dr. Gibson had all given her their votes and told her so.

74.     Plaintiff believes she was the clear choice for Chief Resident and believes that several individuals would confirm that to be their impression as well. Dr. Zee told Plaintiff that he believed she had started the investigation, which painted him in a poor light.

14

75. In fact, Dr. Zee often told Residents to never go to HR with complaints as things would then be "out of his hands." Dr. Zee and Dr. Jae Son (Chief Resident at the time) asked Plaintiff to stop coming to Residency Administration with any concerns. Other residents continued to be welcomed by Residency Administration.

76. Typically in February of each year, the next two Chief Residents were always announced. There were always two. Family Medicine had held elections and had announced the Chief Residents. Yet Dr. Zee refused to announce his picks, and several months went by.

77. Dr. Guinsler told Plaintiff that Dr. Zee begged him to be Chief Resident about 10 times. Dr. Guinsler responded that he would only do the job if Plaintiff did it with him because he did not want to do it with Dr. Mazhuvanchery, who has a reputation for being unapproachable.

78. Dr. Zee declined to pick Plaintiff despite not having any legitimate reason. Prior to announcing Chief Resident, Dr. Zee stated Dr. Mazhuvanchery was not adequate for the position and that it could not go to her.

79. In March of 2021, Defendant conducted a seminar related to sexual harassment. Plaintiff was forced to participate. Residency Administration knew that Plaintiff was in the middle of taking the final medical board licensing exam, Step 3, which is a two-day exam. She was forced to attend the seminar on the rest day, in the middle of her test.

80. Because of the purposeful similarities between her situation with Dr. Fechter and what was being discussed during the seminar, all Internal Medicine, Family Medicine residents and all administrators present began to turn around and stare at Plaintiff, to see her reaction. **Melissa Newman, in front of the entire audience, asked the lawyer presenting the seminar what to do if "The Resident (who was the victim of harassment) was being too sensitive?"**

81.     This entire proceeding was recorded by Defendant with audio and video equipment. Plaintiff thought she was going to have a panic attack. She could barely breathe. She left the seminar and went outside. Another Resident, Dr. Madeline Hudak, came out to check on her and she realized that she could not continue this way.

82.     Less than a week after her board exam on March 17, 2021, Plaintiff went to HR and told them everything that happened to her. Specifically, she spoke to then-Chief Medical Officer, Dr. Renee Wagner and another HR and hospital administrator, Deb Palmer.

83.     Ms. Palmer merely asked Plaintiff if Dr. Fechter punched her. But Plaintiff had made no allegation that Dr. Fechter physically punched her. Short of physically punching Plaintiff, nothing mattered. It is questionable, why no action was taken against Dr. Fechter after Plaintiff gave her testimony to Dr. Wagner and Ms. Palmer. This establishes that aside from knowledge through other employees, now Defendant had direct knowledge from Plaintiff about what had happened to her, but they did nothing.

84.     Defendant certainly has protocols in place regarding what to do when an employee formally complains about sexual harassment. Dr. Wagner and Ms. Palmer should have elevated Plaintiff's concerns and re-opened the investigation into Dr. Fechter or have launched a new one. It is obvious that there was a need to address the information brought forth by Plaintiff. Again, Defendant did nothing.

85.     No action was taken against Dr. Fechter, and he continued to work for Defendant until he successfully graduated. He was assisted by Dr. Zee to get a position with the University of Wisconsin Medical Center as a fellow-in-training, to further his career as a specialized physician.

86. Plaintiff values her reputation very highly and is known to be a highly capable resident. She does not like to address malignant rumors and prefers to do her work. Despite this, she has been approached by attendings publicly telling her that they have heard Dr. Fechter's story and want to know from her if it was "really that bad." Several attending physicians and nurses approached her to ask her about it, that can be identified during discovery. Plaintiff could not go through a week of residency without being approached by someone at FMC regarding these events.

87. Realizing that Residency Administration would not speak with her, Plaintiff approached outgoing CMO (Chief Medical Officer), Dr. Renee Wagner regarding the retaliation that Residency Administration was showing her.

88. Dr. Wagner set up a meeting between herself, Plaintiff, and the incoming-CMO, Dr. Mark Darnell. Plaintiff was told by Dr. Darnell that he would not approach Dr. Zee on her behalf. He told Plaintiff to "play nice" as Dr. Zee was her program director and held a lot of control over her life and entirely controlled her career. She was told if she complained, Dr. Zee could make her life "very difficult." Plaintiff gave up as she knew they would not help her. Dr. Darnell also told Plaintiff to be careful as Dr. Zee had control over her future Letter of Recommendation and career opportunities.

89. Following that meeting, the announcement of Chief Resident was made in late May of 2021. Much to her surprise (and everyone else's), Plaintiff was not named Chief Resident. Plaintiff's accolades and qualifications were well above those of the resident chosen as Chief Resident. She has never had any disciplinary action or poor evaluations, unlike her other classmates, including the resident chosen as Chief Resident.

90.    Dr. Zee said in front of Dr. Parker Guinsler and Plaintiff during a clinic day in Summer 2021, that he could not pick Plaintiff as Chief Resident as this "would have made Buckley [Dr. Fechter] mad."

91.    Dr. Fechter had long tried to be made Chief Resident himself by repeatedly approaching Dr. Zee. Dr. Zee remarked to Dr. Guinsler that he had considered making Dr. Fechter Chief Resident to appease him.

92.    Dr. Mazhuvanchery was made Chief Resident and for the first time in years, the class had only one Chief Resident.  Dr. Mazhuvanchery would become known amongst her residents to have the lowest resident evaluation scores of any chief resident at the program.

93.    Multiple residents, including Dr. Chris Gibson, Dr. Jae Son, Dr. Parker Guinsler, Dr. Madeline Hudak and Dr. Imthiaz Khan individually went to Dr. Zee throughout Spring 2021 to discuss having Plaintiff picked as Chief Resident. Plaintiff did not ask them to do so. At each turn, no concrete reasoning was given for not picking Plaintiff.

94.    The residents were concerned as they wanted an approachable leader. To this day, no reason has been given for her deliberate omission, other than upsetting Dr. Fechter and Dr. Zee's suspicion of Plaintiff going to HR. Dr. Zee told Plaintiff that he "didn't know that you did not go to HR to launch that complaint."

95.    Dr. Zee did approach Plaintiff, asking her to perform the main duties of Chief Resident, scheduling attending lectures (due to her renowned rapport with attendings) and scheduling all residents. These duties were requested without giving the title of Chief Resident.

96.    Plaintiff applied in her final year of residency to fellowship, to become a specialized physician. A well-known, large component of matching into a fellowship, is being a Chief Resident. Fellowship program directors have been known to say they "always interview and give

18

preference to chief residents". Because of the fact that she was not named Chief Resident, she failed to "match" into a fellowship.

97.     The failure to match will have catastrophic implications for the future of Plaintiff's career, as she can no longer obtain a fellowship because of it. The individual named chief resident, Dr. Suzanne Mazhuvanchery, was able to match into a competitive fellowship. The entirety of her application and background training closely mirrors Plaintiff.

98.     The only exception being that Dr. Mazhuvanchery was Chief Resident. Dr. Gibson was also an FMC graduate able to match into the same specialty that Plaintiff is interested in, Rheumatology. The difference being that Dr. Gibson was Chief Resident of his class.

99.     In June 2022, at the resident class graduation ceremony held at the Ale House in Lancaster, Ohio, Dr. Mazhuvanchery gave a speech to all residents, their families and FMC head administrators including: Dr. Darnell and Jack Janoso, CEO. In this speech Dr. Mazhuvanchery outlined how Dr. Zee personally called each fellowship program Dr. Mazhuvanchery was interested in and allowed her to split her visiting rotation to visit more programs. She cried about how his support was absolutely pivotal to help her and others (such as Dr. Fechter) match into their respective fellowship programs.

100.     To date, Dr. Zee has never made a single phone call for Plaintiff, but rather has actively sabotaged her efforts to match into fellowship as outlined below. He forbade her from visiting his office and wrote her poor Letters of recommendation. Dr. Zee is known to say to graduating residents that as they belong to a small, unknown community residency program, his support via phone calls and emails is necessary.

101.     In applying for fellowship training, job positions and anything at all following graduation from a residency program, a glowing letter of recommendation from the residency's

Program Director (in this case, Dr. Zee) is unwaveringly necessary. Its importance cannot be underscored enough.

102.    After not having matched into fellowship, a fellowship program director shared with Plaintiff that they were surprised at the quality of her letter of recommendation from Dr. Zee, compared to her other letters of recommendation. The letter from Dr. Zee was the weakest of her letters. They underscored that this should be the best letter to afford a candidate a chance at fellowship. Plaintiff was directed to request another letter of recommendation from Dr. Zee. The fellowship program director added that this likely had additionally largely hurt her chances at matching in a fellowship.

103.    In the letter, Dr. Zee specifically mentioned a medical condition that Plaintiff suffered from as a child.  There is no legitimate reason to include this in a letter of recommendation for a physician.

104.    In the resident IM Manual, it is stated that each year residents are allowed up to 5 days to attend a medical conference, which is a graduation requirement. This time is separate from Paid Time Off as it is for medical education. When Plaintiff requested time to attend a conference, she was denied.

105.    What is deemed a "required conference" is entirely left up to the whim of Dr. Zee. The resident manual states a required conference must be a critical care conference, which is historically offered in the first year of residency. Plaintiff was not offered this opportunity.

106.    On February 23, 2022, she reached out to her DIO, Dr. Hampton for assistance as Dr. Zee was continuing to be retaliatory and denying her a conference, to which Dr. Hampton responded via email: "Only the critical care conference is considered 'required.'  All other conferences an IM resident may attend are considered elective."

107.    She was denied her ability to use her conference money and fulfill this requirement. Interestingly, multitudes of residents were allowed to go to several unrequired conferences, indicating clear favoritism or conversely continued institutionally accepted retaliation.

108.    Undeterred, on May 23, 2022, Plaintiff then compiled a list of residents including numerous Family Medicine and Internal Medicine residents who were all allowed to go to medical conferences (several years in a row), without expending their PTO.

109.    As it was clear neither Dr. Zee nor Dr. Hampton had any inclination to help her, she went to the hospital CMO, Dr. Darnell.

110.    After much deliberation and fact-checking, she was told via email that while she was still not being "allowed" to go, but Dr. Darnell would not actively stop her. Only then, was she allowed to complete her graduation requirement.

111.    The emails detailing the lengths Plaintiff had to go to show how harshly and biased her treatment was compared to her peers. Specifically, she emailed hospital CMO, Dr. Darnell and said the following:

Hi Dr. Darnell,

I hope this email finds you well. I am reaching out to you, as I was instructed to do by Dr. Zee. My request is simple: I'd like my $99 conference fee to be funded by the remainder of my education money, and be allowed to attend my conference days.

Explanation:

I was told by Melissa Newman I had run out of my conference money. This is a correct statement. However, it is commonplace for residents to use their allotted education money that is left over. This denial is odd and confusing. Upon discussion with the other residents, it appears that I've singularly been told "No" in this scenario, and others are free to dip into their education money after they run out of conference funds. This statement was also previously confirmed by Katherine Slykerman who handles GME money.

I'm obviously a third-year resident, and have never been allowed to utilize my yearly conference days. Starting intern year, residents go to the critical care conference. Interestingly, I'm about to graduate and only after MULTIPLE requests did the inquiry get taken seriously. I have still not heard back on whether I am going or not. Nothing is on my schedule to indicate I am in-fact, going.

I have previously attempted to approach my DIO regarding being allowed my conference days. I was denied previously and told that since it is a virtual conference that I could do it in my own time. And that my conference was not "required". However, of the residents listed below, some have gone to virtual meetings and all have gone to unrequired conferences without using PTO days. This is disparate treatment and reveals obvious bias.

Conference days have historically been used for board prep. It is post-pandemic 2022, commonly these courses are now offered online. And attended virtually in real-time to allow for questions and answers. I requested to use my conference days for this conference. I got written and verbal approval from my PD. He told me to get approval from my Cardiology attendings and I did that as well. Suddenly, I was denied this request as well. I will list below the residents who have been able to go to conferences this year without using PTO. To single me out again feels peculiar, punitive, retaliatory, and intentional. This is obviously not a new phenomenon for me from the GME office. Nor is this a new request from me to you. Regardless, I ask you to rectify the situation, as I do not appreciate being treated as separate and unequal.

So, to summarize: I'd like my conference funded and my conference days for board review.

112.    Throughout the Fall, Winter of 2021 and Spring of 2022, Plaintiff's classmates were all being accepted to fellowship programs and employment offers. Plaintiff kept trying to match into late-opening fellowship programs, which were scant, and trying to get a job to no avail.

113.    In April of 2022, Plaintiff found out from multiple, verifiable residents who had documented proof, that Dr. Mazhuvanchery (Chief Resident) had asked a group of residents including: Dr. Gene Michael, Dr. Faizan Haider and Dr. Brandon Singh, and others to isolate Plaintiff at Dr. Zee's instruction. This was so she would feel unsupported and not muster the gall to complain further regarding her unethical treatment at her residency training program. There is documented proof of this via text messaging.

22

114.    In May of 2022, Plaintiff approached Dr. Zee for a new letter of recommendation. She informed him of how the letter was received by fellowship program directors. He agreed to write her a new letter. Nothing came of this request.

115.    Near the end of July of 2022, Plaintiff's counsel sent an inquiry to Defendant's counsel concerning Plaintiff's letter of recommendation.

116.    Plaintiff sent information per request of Defendant's counsel of what an appropriate letter of recommendation from a residency program director should contain. This included the fact that such letters of recommendation have a "coded language" whereby a short letter indicates that a candidate is poorly suited and should not be seriously considered. There were also peer-reviewed research articles and figures attached from the American College of Cardiology indicating what an appropriate letter of recommendation for any medical subspecialty fellowship should contain. It revealed that phrases like "I recommend" could be viewed as weak endorsements whereas phrases like "This candidate has my highest recommendation" were what fellowship program directors were looking for. Plaintiff also included all of her accolades and examples of her strong performance, as she had been told by fellowship program directors that these had not been included.

117.    In July of 2022, Plaintiff approached a fellowship selection committee member at East Carolina University for guidance in obtaining a research position. During her Zoom interview with this faculty member, to whom she had forwarded Dr. Zee's letter of recommendation, she was told that her letter was weak and contained references to a private HIPAA-protected medical condition and that she was "extremely disappointed" when denied Chief Resident-hood.

118. Plaintiff was startled as to why these things, that she had not given consent to, were contained in her letter of recommendation. Including these items in a letter of recommendation is not only ridiculous, it is intentionally meant to sabotage.

119. Plaintiff's counsel again approached Defendant's counsel requesting a new letter of recommendation. Plaintiff was concerned as her fellowship application was to be submitted in July of 2022 and her extremely important program director letter of recommendation contained HIPAA-protected content, to which she had not given consent. It did not feature her residency highlights either, not painting her in a favorable light as was revealed to her by the East Carolina University faculty member.

120. Defendant categorically denied the mention of any medical condition and Plaintiff's emotions when denied the title of Chief Resident, when there is no dispute that the letter reflects those exact items.

121. Defendant did not provide a new letter of recommendation.

122. Plaintiff has lost another application cycle for fellowship. It is well-known that the most desirable fellowship applicants are in their final year of residency. In the following few years an applicant's candidacy chances drop exponentially. In harming Plaintiff's chances for the most important year and the following year, Defendant has affected irreparable harm on her career and job prospects.

123. In an attempt to appear non-retaliatory, Dr. Zee has started emailing Plaintiff about job and fellowship opportunities of which she is already aware. His letter discourages her from being hired.

124. Plaintiff is the only graduate of her class who has not yet found a job placement, each job requests a letter of reference from her program director.

## COUNT I - TITLE VII
### Sexual Harassment: Hostile Work Environment

125.    Plaintiff reasserts and reincorporates each and every allegation contained in the paragraphs above as if fully rewritten herein.

126.    Defendant engaged in conduct that violates Title VII prohibiting sex discrimination by sexually harassing Plaintiff, by creating and encouraging a hostile work environment for Plaintiff based on sex, by refusing to remedy the situation and provide a reasonable and non-hostile work environment, and by denying Plaintiff the position of Chief Resident because of her reports.

127.    Plaintiff was subjected to unwelcomed sexual harassment when Defendant's employee Dr. Fechter stalked, threatened, intimated, and made sexual advances towards Plaintiff.

128.    Plaintiff immediately reported the sexual harassment to Defendant.

129.    The harassment was based on Plaintiff's sex.

130.    The harassment unreasonably interfered with Plaintiff's work performance because she became afraid at work, avoided the resident's lounge, and became emotionally shut down.

131.    The harassment was sufficiently severe or pervasive enough to create a hostile or offensive working environment because Plaintiff felt unsafe at work in the presence of Dr. Fechter.

132.    Defendant knew or should have known of the charged sexual harassment because Plaintiff continually reported the harassment to Defendant.

133.    Defendant failed unreasonably to take prompt and appropriate corrective action because it merely instructed Plaintiff to "get along with others," refused to discipline Dr. Fechter, and failed to separate the two.

134.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including, but not limited to, loss of

salary, benefits, and other terms, privileges and conditions of employment for which Defendant is liable.

135.    Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

**COUNT II - TITLE VII**
**Retaliation**

136.    Plaintiff reasserts and reincorporates each and every allegation contained in the paragraphs above as if fully rewritten herein.

137.    Plaintiff engaged in a protected activity by, inter alia, opposing the sexual harassment and hostile work environment.

138.    Defendant was aware that Plaintiff engaged in a protected activity, as she reported the sexual harassment to Dr. Khan and Dr. Zee, among others.

139.    Once Plaintiff engaged in a protected activity, Defendant intentionally retaliated against her by refusing to remedy the situation, refusing to provide a reasonable and non-hostile work environment, refusing to grant her the position of Chief Resident, providing a negative letter of recommendation and otherwise discriminating against her in the terms, privileges, and conditions of her employment.

140.    As a direct and proximate cause of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but not limited to, pain and suffering and the loss of salary, benefits, and other terms, privileges, and conditions of her employment for which Defendant is liable.

141.     Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

**COUNT III - Ohio Civil Rights Act**
**Sexual Harassment: Hostile Work Environment**

142.     Plaintiff reasserts and reincorporates each and every allegation contained in the paragraphs above as if fully rewritten herein.

143.     Defendant engaged in conduct that violates R.C. 4112 prohibiting sex discrimination by sexually harassing Plaintiff, by creating and encouraging a hostile work environment for Plaintiff based on sex, by refusing to remedy the situation and provide a reasonable and non-hostile work environment, and by denying Plaintiff the position of Chief Resident because of her reports.

144.     Plaintiff was subjected to unwelcomed sexual harassment when Defendant's employee Dr. Fechter stalked, threatened, intimated, and made sexual advances towards Plaintiff.

145.     The harassment was based on Plaintiff's sex.

146.     The harassing conduct was sufficiently severe or pervasive to affect the terms, conditions and privileges of Plaintiff's employment.

147.     Defendant knew or should have known of the harassment, yet did not take immediate and corrective action, aside from briefly investigating the allegations.

148.     As a result of the hostile environment described herein and because she opposed the sexual harassment, Plaintiff was denied the promotion to Chief Resident.

149.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but not limited to, serious

emotional distress and the loss of salary, benefits, and other terms, privileges and conditions of employment for which Defendant is liable.

150.    Defendant's conduct was willful, wanton, reckless, and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

## COUNT IV - Ohio Civil Rights Act
### Retaliation

151.    Plaintiff reasserts and reincorporates each and every allegation contained in the paragraphs above as if fully rewritten herein.

152.    Plaintiff engaged in a protected activity by, inter alia, opposing the sexual harassment and hostile work environment.

153.    Defendant was aware that Plaintiff engaged in a protected activity, as she reported the sexual harassment to Dr. Khan and Dr. Zee, among others.

154.    Once Plaintiff engaged in a protected activity, Defendant intentionally retaliated against her by refusing to remedy the situation, refusing to provide a reasonable and non-hostile work environment, refusing to grant her the position of Chief Resident, writing her a negative letter of recommendation and otherwise discriminating against her in the terms, privileges, and conditions of her employment.

155.    As a direct and proximate cause of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but not limited to, pain and suffering and the loss of salary, benefits, and other terms, privileges, and conditions of her employment for which Defendant is liable.

156.     Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

## COUNT V – TITLE IX
### Deliberate Indifference

157.     Plaintiff reasserts and reincorporates each and every allegation contained in the paragraphs above as if fully rewritten herein.

158.     Dr. Fechter sexually harassed Plaintiff on multiple occasions by making sexual comments to her, threatening her, and stalking her because of her sex.

159.     The harassment that Plaintiff experienced was so severe, pervasive, and objectively offensive that it denied Plaintiff equal access and enjoyment of educational opportunities and benefits.

160.     Defendant had actual knowledge of the sexual harassment by Dr. Fechter against Plaintiff because Plaintiff reported the harassment to Defendant multiple times.

161.     Defendant's responses to the harassment were unreasonable in light of the circumstances that it was aware of, in violation of 20 U.S.C. § 1681(a).

162.     Defendant was deliberately indifferent to Plaintiff's known sexual harassment and the sexually hostile educational environment when it failed to institute reasonable accommodations for Plaintiff's safety and mental well-being, including but not limited to: (i) disciplining Dr. Fechter; (ii) prohibiting Dr. Fechter from coming into contact with Plaintiff, (iii) providing Plaintiff a safe work environment; and (iv) providing a fair and impartial sexual misconduct investigation.

163.     As a result of Defendant's deliberate indifference, Plaintiff was deprived of equal educational opportunities at Defendant.

164.     As a result of Defendant's deliberate indifference, Plaintiff suffered further sexual harassment at the hands of Dr. Fechter.

165.     Because of the ongoing sexually hostile environment that Defendant deliberately failed to address, Plaintiff suffered losses of educational opportunities and benefits, along with injuries, damages, and losses including damage to her pursuit of higher education, delay in her pursuit of higher education, loss of promotion, fear, anxiety, trauma, and emotional distress.

## COUNT VI – TITLE IX
### Retaliation

166.     Plaintiff reasserts and reincorporates each and every allegation contained in the paragraphs above as if fully rewritten herein.

167.     Plaintiff engaged in a protected activity by, inter alia, opposing the sexual harassment and hostile work environment.

168.     Defendant was aware that Plaintiff engaged in a protected activity, as she reported the sexual harassment to Dr. Khan and Dr. Zee, among others.

169.     Once Plaintiff engaged in a protected activity, Defendant intentionally retaliated against her by refusing to remedy the situation, refusing to provide a reasonable and non-hostile work environment, refusing to grant her the position of Chief Resident, writing her a negative letter of recommendation and otherwise discriminating against her in the terms, privileges, and conditions of her education.

170.     As a direct and proximate cause of Defendant's conduct, Plaintiff has suffered and will continue to suffer economic and non-economic damages, including but not limited to, pain and suffering and the loss of salary, loss of career and business opportunities, loss of reputation,

humiliation, embarrassment, benefits, and other terms, privileges, and conditions of her education for which Defendant is liable.

171.    Defendant's conduct was willful, wanton, reckless and/or malicious for which Defendant is liable for compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff demands:

For all Counts, monetary damages including back pay and benefits, statutory liquidated damages, expert witness fees and attorneys' fees and costs, and front pay, compensatory damages and punitive damages in an amount to be determined at trial, but in any event not less than $75,000.00 and any and all other relief, which the Court deems just and appropriate.

Respectfully submitted,

/s/ *Rachel Sabo Friedmann*
Rachel Sabo Friedmann (0089226)
(*Rachel@TheFriedmannFirm.com*)
Peter G. Friedmann (0089293)
(*Pete@TheFriedmannFirm.com*)
Jamie R. Bailey (0099789)
**The Friedmann Firm LLC**
**(614) 610-9757**
3740 Ridge Mill Drive
Hilliard, OH 43026

*Attorneys for Plaintiff*

## **JURY DEMAND**

Plaintiff hereby requests a jury of at least eight (8) persons.

/s/ *Rachel Sabo Friedmann*
Rachel Sabo Friedmann (0089226)